J-A04026-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| C.A.S. AND J.A.S. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| E.R.S. AND L.C.J. | |
| APPEAL OF: E.R.S. | No. 1072 WDA 2015 |

Appeal from the Order Dated June 15, 2015
In the Court of Common Pleas of Jefferson County
Civil Division at No(s): Number 852 of 2013, C.D.

BEFORE: FORD ELLIOTT, P.J.E., BENDER, P.J.E., and SHOGAN, J.

MEMORANDUM BY BENDER, P.J.E.: **FILED MARCH 30, 2016**

E.R.S. ("Father") appeals from the June 15, 2015 order awarding him and C.A.S. and J.A.S. (Paternal "Grandparents") joint legal custody of R.J.S. ("Child"), born in October of 2005. The order also awards Grandparents primary physical custody and Father partial physical custody. After review, we affirm.[1]

Grandparents filed the petition for special relief, which began this litigation, in October of 2013. They requested custody of Child, relying on the fact that they have been Child's primary caregivers since he was 20 months old. Following the completion of psychological evaluations of the

_____

[1] L.C.J. ("Mother"), who lives in Canada, has had no contact with Child or the parties in this case since Child was less than one year old. She is not a party to this appeal.

parties, a hearing took place on June 5, 2015. At the hearing, both Grandparents testified and presented the testimony of Kathryn Hedrick, the mother of Father's girlfriend, and Robert George Ryhal, Grandmother's brother. Father testified on his own behalf and presented the testimony of his girlfriend, Farron Remaley.

The following facts are gleaned from the trial court's findings of fact regarding the testimony of the various witnesses. Grandmother testified that she lives with Grandfather, Child and her youngest son, Brian. She further indicated that although she has an LPN certification, she has been a stay at home mother. Grandmother also explained that when Child was born in Washington State in October 2005, while Father was serving in the Navy, she visited the family there. Upon her arrival home, Father informed Grandmother that he was filing for a divorce from Mother. Grandmother provided financial help and, when Mother attempted suicide and was placed in a mental institution, Grandparents returned to Father's residence from February through March 2006 to help Father with childcare duties.

For Christmas 2006, Grandmother sent plane tickets to Father, and he and Child came to Pennsylvania. Father remained for a week, while the Child stayed on. Through 2007, Father called Child on a daily basis. Father returned to Grandparents' residence for a week around the Christmas holiday in 2007, and returned to Washington State until his discharge from the Navy in February 2008. He then resided with Grandparents until he moved to Monroeville, Pennsylvania, after procuring a job there. Child

visited Father on weekends and moved into Father's home in September 2008. However, Child returned to live with Grandparents in October of 2008 due to Father's work schedule and his attendance at college to earn a degree.[2]

Grandmother further testified about Father's visits, explaining that Father would arrive on Friday nights around 1:00 a.m. and would leave on Sunday afternoon. Grandmother also explained about her care of Child, including his medical appointments,[3] and Father's lack of financial contributions. In the spring of 2009, Grandmother placed Child in DZ Kids Day Care so that he would experience interaction with other children. Through the summer of 2010, Father visited once or twice a month and called several times a week. Via email, Grandmother informed Father of Child's progress in nursery school and about any medical issues. In 2011, when Child needed to be registered for kindergarten, Father again relinquished the decision-making to Grandmother. From September 2011 to June of 2015, Child attended school in the Brookville School District, where Grandparents lived. His report cards evidence that Child is a good student

_____

[2] Also in 2008, Father initiated custody proceedings against Mother. The action was dismissed for inactivity in 2011.

[3] Grandparents introduced into evidence a packet of medical records to show that Grandmother handled all medical matters for Child. A letter from Father was also introduced, providing that he gave Grandparents "the right to decide everything necessary in Child's life." Trial Court Opinion (TCO), 6/16/15, at 3 ¶ s (unpaginated).

and is well behaved. Grandmother also discussed Child's extracurricular activities.

Additionally, the court formulated the following findings of fact relating to Grandmother's testimony:

y. Other than the six to eight weeks in 2008, Child has lived constantly with Grandparents since September of 2007, when he was 21 months old.

z. [Grandmother] testified that the evaluator[']s rendition of the history of a relationship between her son and her family was not accurate. She claims the relationship has always been [Grandparents'] supporting [their] son emotionally and financially and she disagrees with the constant conflict picture [the evaluator] paints. She indicated that throughout much of their time, they were in daily contact regarding Child. She further stated that she raised none of her children any differently than the others and any differences between the children come from each child's own uniqueness.

. . .

cc. She further critiqued the evaluation by saying she disagreed with the information provided by her son's girlfriend, Farron, specifically saying [Farron] was [not] divorced and saying [Farron] had [not] always had legal custody of her own children.

dd. She placed into evidence a number of e-mails acknowledging that for many of the medical issues and athletic issues, she never asked for Father's permission but rather just communicated to him so [F]ather would know what was going on.

ee. She indicated that Father always came to family events and is still invited to all family events but the last event he participated in was Child's birthday party in October[] 2013.

ff. She indicated that in her opinion, the substantial change came at the beginning of 2013, when Father asked if he could take Child on a fieldtrip to Washington, D.C., for a week, which

he did. She indicated that shortly after that trip, their relationship changed. She added to that saying[,] "To this day, I don't know what happened." She further indicated that Father never indicated he wanted to return to primary custody. He only indicated that he wanted to see Child more.

gg. In June of 2013, Father indicated that he was planning on taking Child to live with him in the fall. Grandmother indicated she responded that was not a good idea to pick up and take him from everything he had ever known especially while Father was working 3:30 to 11:30.

hh. In October of 2013 when they heard from the school that Father was going to take Child from the school[,] Grandparents took legal action to formally obtain custody of Child which was the start of this custody case.

. . .

mm. Grandmother testified about a December 22, 2014, voice message she received from a woman who indicated she was trying to meet "[Child's] Nana" and "Can you help me in locating my grandchildren?" The message was from Kathryn Hedrick who would testify later in the trial. The purpose in bringing it up is Grandmother's state of mind concerning of the level of stability of Father's girlfriend.

nn. On cross examination, Grandmother acknowledged that when she had [Child] at her house at first, she did not intend on it being a forever thing but indicated that she did not think it was good for him to move back and forth every three to four months.

TCO at 4-5.

Grandmother further testified that Child "is always alright with going to his father's[,]" but after returning from a visit with Father, he is quiet, wants to be hugged, and "on Sunday nights he asks one of his [G]randparents to lie in bed with him for a … little bit." *Id.* at 5. Grandmother also submitted information from the Department of Education's website, which indicated

- 5 -

that the Brookville School District is better than the Penn Hills School District where Child would attend if he lived with Father.

The next person to testify was Kathryn Hedrick, the mother of Father's girlfriend. Mrs. Hedrick explained that she contacted Grandmother by phone because of her concern about her own grandchildren. She also indicated that her daughter Farron's three children, ages 15, 13, and 11, had been in her custody throughout most of their lives, essentially from November 2003 until 2013, with Farron only visiting occasionally. She stated that from 2012 through October of 2014, when Farron moved in with Father, Farron had lived with three different men. Mrs. Hedrick further indicated that a court order provides for her to have shared custody of her grandchildren, an order that she is trying to have enforced through a contempt petition filed in Armstrong County. She also testified about a series of videos that her grandson placed on her computer, showing Father and her grandchildren duct taping her grandson. The court noted that it "appears from the video that the child is laughing during part of the video but it also appears that he is gasping in part of the video. It would be an understatement to say the [c]ourt finds the entire video to be disturbing." TCO at 7 ¶ i.

Robert George Ryhal, Grandmother's brother, testified that he is a licensed private investigator and retired from the Pennsylvania State Police after 25 years of service. Mr. Ryhal explained that he has three sons around Father's age and that they all had a good relationship and often got together. He also testified that he thought Father was amiable and had a

good relationship with his parents until recently. As an example, he described a soccer match that had taken place the year before, at which Father and Farron stood off from the rest of the family. After speaking with them, he recognized there was obvious tension.

Grandfather testified next, discussing his work in environmental science for Continental Cooperative Services, a company he has worked for since 1993. His job requires him to travel about 30% to 40% of the time. Grandfather further explained that he has claimed Child as a dependent for federal tax purposes, that he has provided for Child and that Father has never contributed. He also testified that he and Father had "a great relationship[,]" that "began to deteriorate right after the March 2013 field trip to Washington D.C." *Id.* at 8 ¶ g. Grandfather also discussed a custody exchange near Father's residence that resulted in his being cited for defiant trespass for which he was found not guilty. He also submitted documentation that revealed Farron's conviction for harassment in 2004, and also noted that Father and Farron were listed on the landlord/tenant docket three times since 2008.

Grandfather further testified about his relationship with Child and the activities in which they engage, namely baseball, gardening, camping overnight and fishing. He also explained that his travel for work occurs during the week and that he has flexibility, allowing him to be available to do activities with Child. Grandfather also asserted his belief that it would be in Child's best interest to remain with Grandparents.

Father was the next witness to testify. He discussed his nuclear propulsion work in the Navy and his current job relating to nuclear generators with Curtis-Wright, a position he has held since July of 2008. Father testified that his marriage to Mother ended in September 2006 and that he received primary legal and physical custody of Child. He indicated that Grandparents had primary custody of Child while he was still in Washington State and after he moved back to Pennsylvania. He acknowledged that "it was nice to not have to make some of the decisions in parenting." *Id.* at 9 ¶ e. However, he contended that he saw Child every other weekend since moving to Pennsylvania.

Father also testified "that '[h]e made the responsible decision to provide stability for his son' knowing that he could not reliably hold day shift and having to work night shift, he decided to leave his minor child with his parents so they could care for Child." *Id.* at 10 ¶ h. This situation continued even after Child started school. Father further explained that he attempted discussions with Grandparents about transitioning Child to his care in 2011, but that Grandparents "would not listen to him." *Id.* at 10 ¶ k. He claimed that "he never intended to give up parental rights or custody and that all decisions regarding [Child] were made by [Grandparents] without consulting him." *Id.* at 10 ¶ n. Father also testified about his good relationship with Child and the activities they participate in together, *i.e.*, fishing, camping and making "s'mores." *Id.* at 10 ¶ o. Father acknowledged his concerns with the school district where he lives and his

plans to move when he is financially able. Father also testified that he has no drug, alcohol or mental health issues and that he is able and available to care for his son even though he is rarely consulted by Grandparents.

The last witness to testify was Farron Remaley. She testified that she is a transfusion nurse, working for Transfusion Medicine, although she does not have a nursing degree. Rather, she has an associate's degree as a medical assistant. She has lived with Father for three years and has three children, ages 15, 13 and 11. The court also listed the following findings of fact relating to Farron's testimony:

> c. She indicated that she is currently going through a divorce with her husband, further she states "morally, [she] is not married."

> d. She indicated that she left her children with her mother because she had two jobs and school and felt it was a good arrangement for her children to live with her mother [but she now has safety concerns with the children living with her mother].

> e. She acknowledged the PFA filed against her and she acknowledged that she "302'd" her husband but indicated that the PFA was retaliation. She acknowledged that she violated and took house arrest and also acknowledged that she was "in trouble with the law" when she was younger.

> f. In at least one of the events, she acknowledged that she could not remember what the punishment was. She discussed the video of duct taping her son indicating that her son was laughing and it was all in good fun.

> g. She indicated that she will not let her children see their grandparents currently because the children are not safe with them, indicating the children had to go number one and number two outside.[] She further indicated that she believed her

- 9 -

mother was "instilling racism" in her children.  She finally said, "If I ever wanted to do drugs, I would go to her first."

h. She describes Father as a kind, patient person with his child, stating "they take him to the science center, the zoo" and that [Child] can "kick my butt at tennis."

i. She indicated that Plaintiff Grandmother did assault her but she felt charges would only make a bad situation worse. However, she did agree that she had Grandfather cited for defiant trespass indicating that she felt her children were at risk with him entering their apartment.  She acknowledged he was found [not] guilty.

j. She also indicated she violated the custody order but said "[m]orally, I am not violating that Order."

k. She acknowledged that she had been investigated several times by several Children and Youth Departments.

TCO at 11-12 ¶¶ c-k.

The trial court also noted its private interview with Child, expressing its intent to take Child's statements and preferences into account in arriving at its custody decision without identifying what Child stated.  Following this extensive recitation of the testimony, the court stated that:

1. [Grandparents] have standing to file for legal custody and any form of physical custody under 23 Pa.S.C.A. §5324(iii)(c).

2. Pursuant to 23 Pa.S.C.A. §5327(b), the law provides a presumption of custody be awarded to a parent and that the presumption may be rebutted by clear and convincing evidence.

*Id.* at 13.  Then the court discussed the factors listed at 23 Pa.C.S. § 5328(a)(1) – (16), arriving at the conclusion that Father and Grandparents should share joint legal custody of Child, and that Grandparents should retain primary physical custody, with Father having partial physical custody.

- 10 -

Specifically, the court discussed its credibility decisions relating to the witnesses, noting that Grandparents and their witnesses were credible and that almost all of their assertions were "backed up with a document or some form of physical evidence." *Id.* at 17. However, the court found that Farron Remaley was not credible in almost all instances and Father not credible in some of his assertions. Additionally, the court stated:

> Further, this [c]ourt specifically finds that Dr. Schachner was not credible in finding that a move to Father's residence would not be harmful to the child. This [c]ourt believes that considering all of the evidence entered it would be, at its best, a harmful move to [C]hild, taking a well[-]balanced, well[-]adjusted child and placing him primarily in what can at best be described, a chaotic environment. At worst, there could be potential abuse and violence issues between Farron, her own children and [Child]. There also would be the issue of the less suitable school district and finally the issue of[C]hild's care when Father is at work.
>
> The psychological report finds that Father meets the basic level of an acceptable parent. Father has done far better than … many people who have come before the [c]ourt, with a full time job and no drug or alcohol addictions. However, Father's evidence that he would provide appropriate care to [Child] as well as provide him contact with his remaining family members is severely lacking. The evidence shows that Father would isolate [Child] from [Grandparents] as well as his extended family. It further shows that he would tend to allow Farron Remaley to be involved in many of [C]hild's care decisions. The evidence shows that Farron Remaley has anger and abuse issues as well as perception and truth telling issues.
>
> The [c]ourt finds that Dr. Schachner's evaluation is not credible to the extent it finds Father's household to be appropriate as the primary custodian and that it would cause no harm to the minor child.

*Id.* at 17-18.

Father appealed and now raises four issues for our review:

- 11 -

> I.  THE COURT ABUSED ITS DISCRETION BY FINDING THE PRESUMPTION OF CUSTODY IN FAVOR OF THE NATURAL PARENT UNDER 23 PA.C.S.A. § 5327(b) WAS REBUTTED BY CLEAR AND CONVINCING EVIDENCE.
>
> II  THE COURT ABUSED ITS DISCRETION IN FINDING THAT FATHER'S GIRLFRIEND PRESENTS A RISK OF HARM TO THE MINOR CHILD UNDER 23 PA.C.S.A. § 5328 (a)(2).
>
> III  THE COURT ABUSED ITS DISCRETION BY FINDING THAT REMOVING THE CHILD FROM PATERNAL GRANDPARENTS' CUSTODY WOULD BE DETRIMENTAL TO THE CHILD UNDER 23 PA.C.S.A. § 5328 (a)(4).
>
> IV  THE COURT ABUSED ITS DISCRETION BY DETERMINING THAT FATHER WOULD NOT PROVIDE A STABLE, CONSISTENT, LOVING, AND NURTURING RELATIONSHIP WITH THE CHILD UNDER 23 PA.C.S.A. § 5328 (a)(9).

Father's brief at 3.

When presented with child custody matters, we are guided by the following scope and standard of review:

> [O]ur scope is of the broadest type and our standard is abuse of discretion.  This Court must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations.  In addition, with regard to issues of credibility and weight of the evidence, this Court must defer to the trial judge who presided over the proceedings and thus viewed the witnesses first hand.  However, we are not bound by the trial court's deductions or inferences from its factual findings.  Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record.  We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

**E.D. v. M.P.** 33 A.3d 73, 76 (Pa. Super. 2011) (quoting **A.D. v. M.A.B.**, 989 A.2d 32, 35-36 (Pa. Super. 2010)).  Furthermore, we note that:

> The discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

*Ketterer v. Seifert*, 902 A.2d 533, 540 (Pa. Super. 2006) (quoting *Jackson v. Beck*, 858 A.2d 1250, 1254 (Pa. Super. 2004)).

*A.H. v. C.M.*, 58 A.3d 823, 825 (Pa. Super. 2012).

The primary concern in any custody case is the best interests of the child. The best-interests standard, decided on a case-by-case basis, considers all factors that legitimately have an effect upon the child's physical, intellectual, moral, and spiritual well-being. *Saintz v. Rinker*, 902 A.2d 509, 512 (Pa. Super. 2006) (citing *Arnold v. Arnold*, 847 A.2d 674, 677 (Pa. Super. 2004)). Furthermore, we recognize that the Child Custody Act (Act), 23 Pa.C.S. §§ 5321-5340, governs all proceedings commenced after January 24, 2011. The specific factors that a court must consider are listed at 23 Pa.C.S. § 5328(a)(1) – (16). *See E.D.*, 33 A.3d at 79-80 (holding that "best interests of the child" analysis requires consideration of all section 5328(a) factors).[4]

_____

[4] Although we are aware that the parties live approximately 80 to 100 miles apart, *see* TCO at 15 (discussing section 5328(a)(11), proximity of the parties' residences), the trial court did not find it necessary to discuss any

*(Footnote Continued Next Page)*

Father's first issue relates to his claim that the court erred in concluding that Grandparents rebutted the presumption of custody in favor of the natural parent by clear and convincing evidence as provided for in 23 Pa.C.S. § 5327(b). Section 5327(b) provides:

> **(b) Between a parent and third party.**—In any action regarding the custody of the child between a parent of the child and a nonparent, there shall be a presumption that custody shall be awarded to the parent. The presumption in favor of the parent may be rebutted by clear and convincing evidence.

In ***V.B. v. J.E.B.***, 55 A.3d 1193 (Pa. Super. 2012), this Court discussed this principle, noting initially that,

> where the custody dispute is between a biological parent and a third party, the burden of proof is not evenly balanced. In such instances, the parents have a prima facie right to custody, which will be forfeited only if convincing reasons appear that the child's best interest will be served by an award to the third party. Thus, even before the proceedings start, the evidentiary scale is tipped, and tipped hard, to the biological parents' side.

***Id.*** at 1199 (quoting ***Charles v. Stehlik***, 744 A.2d 1255, 1258 (Pa. 2000) (internal quotations and brackets omitted)). The ***V.B.*** court further instructed that:

> What the judge must do, therefore, is first, hear all evidence relevant to the child's best interest, and

*(Footnote Continued)* ───────────────────

specific relocation factors found at 23 Pa.C.S. § 5337(h). Moreover, the second, third and fourth issues that Father raises, which relate specifically to the custody factors at section 5328(a)(2), (4), and (9), are encompassed, directly or implicitly, by certain factors contained in the list of relocation factors at section 5337(h). Therefore, we do not believe a remand is required in this case, as suggested by this Court's decision in ***D.K. v. S.P.K.***, 102 A.3d 467 (Pa. Super. 2014).

- 14 -

then, decide whether the evidence on behalf of the third party is weighty enough to bring the scale up to even, and down on the third party's side.

*McDonel v. Sohn*, 762 A.2d 1101, 1107 (Pa. Super. 2000) (quoting *Ellerbe v. Hooks*, 490 Pa. 363, 416 A.2d 512, 513-514 (Pa. 1980)). In *Ellerbe, supra* [416 A.2d] at 514, our Supreme Court noted that "these principles do not preclude an award of custody to the non-parent. Rather they simply instruct the hearing judge that the non-parent bears the burden of production and the burden of persuasion and that the non-parent's burden is heavy." Essentially, the Supreme Court determined, "where circumstances do not clearly indicate the appropriateness of awarding custody to a non-parent, we believe the less intrusive and hence the proper course is to award custody to the parent or parents.

*V.B.*, 55 A.3d at 1199. However,

[i]n *Albright v. Commonwealth. ex rel Fetters*, 491 Pa. 320, 421 A.2d 157, 161 (Pa. 1980), we stressed that the biological parent's prima facie right to custody is not to be construed as precluding a custody award to a non-parent, absent a demonstration of the parent's dereliction. We again emphasize that the standard seeks only to stress the importance of parenthood as a factor in determining the best interests of the child. However, other factors which have significant impact on the well[-]being of the child can justify a finding in favor of the non-parent, even though the parent has not been shown to have been unfit.

We see no reason to abandon our *Albright* holding. As noted *supra*, "the cardinal concern in all custody cases is the best interest and permanent welfare of the child." 421 A.2d at 158. In staying true to that maxim, we have decreed that there will be instances where it is proper to award custody to the third party even where there has been no showing that the biological parent is unfit. While this Commonwealth places great importance on biological ties, it does not do so to the extent that the biological parent's right to custody will trump the best interests of the child. In all custody matters, our primary concern is, and must continue to be, the well-being of the most fragile human participant—that of the minor child.

- 15 -

*Charles*, 744 A.2d at 1259.

Although the trial court recognized the existence of the presumption, it did not directly address it in its decision. However, our review of the court's findings, its discussion of the custody factors, and its credibility determinations reveal that it found that Grandparents carried their heavy burden of proof that it was in Child's best interest to remain with Grandparents, and that they should have primary physical custody rather than Father. Simply stated, the court found that although Father "could maintain a loving, stable, consistent and nurturing relationship [with] Child[,]" Father's "relationship with Farron Remaley[,] who has been a destructive force not only in this relationship but also with her own children's relationship with their grandparents[,]" weighed heavily in favor of Grandparents. TCO at 15 ¶ 9. Thus, the court concluded that "Grandparents have provided a tremendously loving, stable, consistent and nurturing relationship with Child and Child has done emotionally exceptional in their care." *Id.*

One of the cases relied upon by Father, *Jordan v. Jackson*, 876 A.2d 443 (Pa. Super. 2005), concerns a custody situation between a mother and the paternal grandparents of a child that they cared for while the mother, who had drug issues, was incarcerated. The trial court concluded that upon the mother's release from prison, and noting her rehabilitation, it determined that she should be granted primary custody. This Court agreed,

indicating that "there [was] a dearth of evidence that [the child's] interests [were] better served in grandparents['] care, and that was grandparents' burden to prove." *Id.* at 452. In his reliance on *Jordan*, Father quoted the following:

> [The grandparents'] care of the child was all that could be wished, however, that alone cannot be the determining factor in this case. If such were the case, no parent who is out of custody, regardless of the reformation and improvement in lifestyle or parenting ability, could obtain the return of custody. The record supports the trial court's belief in the mother's redemption and also mandates she be given the opportunity to exercise her right as a parent....

*Jordan*, 876 A.2d at 456 (quoting *Burnett v. Verstreate*, 742 A.2d 700, 703 (Pa. Super. 1999)).

In the case before us, the facts relied on by the trial court do not conform to those found in *Jordan*. Although the mother's situation in *Jordan* was more dire, she overcame her difficulties and proved to the court her ability to provide financially and emotionally for the child. Moreover, the grandparents failed to provide evidence that the child's best interests were better served by their having custody. Here, Grandparents not only submitted evidence of their ability to provide for Child in his best interests, but they also proved that Father's situation was less than ideal due to his relationship with Farron, who would have significant input into caring for Child. In light of the credibility determinations formulated by the trial court, which are supported by the record, we cannot and will not re-find and/or re-weigh the evidence. *See C.R.F., III v. S.E.F.*, 45 A.3d 441, 443 (Pa.

Super. 2012) (stating that our standard of review requires that we "accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations"). Taking into consideration the entire record, we conclude that the trial court did not abuse its discretion by concluding that Grandparents had rebutted the presumption of custody in favor of Father. Accordingly, we conclude that Father's first issue is without merit. ***See McDonel v. Sohn***, 762 A.2d 1101 (Pa. Super. 2000) (concluding it is in the best interests of child to grant primary physical custody to aunt and uncle as against father who abrogated his parental duties for most of child's life).

Father next argues that the trial court abused its discretion by finding that Farron Remaley presented a risk of harm to Child pursuant to 23 Pa.C.S. § 5328(a)(2).[5] Interestingly, in connection with this issue, Father's brief contains almost two pages relating to the evidence involving Farron's past, namely, a protection from abuse (PFA) order against her, criminal charges, and investigations by Children, Youth and Family (CYF) agencies, which we recognize were deemed unfounded. However, Father then claims that none of these issues related to the care and/or impact on Child and

---

[5] Section 5328(a)(2) requires the court to consider "[t]he present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child." 23 Pa.C.S. § 5328(a)(2).

should not have weighed against Father. Father cites ***Johns v. Cioci***, 865 A.2d 931, 942 (Pa. Super. 2004), for the proposition that "[u]nless it is shown that a parent's conduct has had a harmful effect on the child, that conduct should be given little weight in custody determinations." In the ***Johns*** case, the trial court drew a negative inference about the mother's failure to maintain a close relationship with extended family as opposed to the relationship that the father had with his extended family. This Court concluded that such an inference was unreasonable and did not support the trial court's conclusion that the mother's home was less suitable.

The comparison between the ***Johns*** case and the present matter reveals major differences. In addition to Farron's PFA, the CYF issues and the criminal charges, the video of the duct taping of one of her children with Child present concerned the trial court. Also, Grandparents' presentation of the testimony of Ms. Hedrick, Farron's mother, shed light on Farron's actions, particularly emphasizing the number of years Ms. Hedrick cared for Farron's three children (eight of the last eleven) and the custody order she was attempting to enforce. In concluding as it did in relation to section 5328(a)(2), the court did not simply rely on testimony about the PFA and CYF investigations without considering other evidence presented by Farron herself. Again, we conclude that the trial court did not abuse its discretion for voicing its concerns about Farron and how her actions could impact the

best interests of Child in that she is a significant member of Father's household.

In his third issue, Father claims that the court abused its discretion by finding that removing Child from Grandparents' custody and placing him in Father's custody would be detrimental to Child pursuant to 23 Pa.C.S. § 5328(a)(4).[6] In its opinion, the trial court stated that "[t]o remove Child from this stable and happy lifestyle [with Grandparents] would be detrimental to Child." TCO at 14, ¶ 4. Moreover, as quoted previously in this decision, the court expressed concerns about placing Child in Father's care due to the "chaotic environment[,]" the "potential abuse and violence issues between Farron, her own children and [Child,] … the issue of the less suitable school district and finally the issue of [Child's] care when Father is at work." TCO at 17.

Father argues that the trial court erred by relying on the fact that Grandparents have been the primary caregivers for many years. He relies on *M.J.M. v. M.L.G.*, 63 A.3d 331 (Pa. Super. 2013), which he cites for the proposition that "our Legislature has rejected the notion that in analyzing both parents, additional consideration should be given to one because he or she has been the primary caretaker." Father's brief at 29 (quoting *M.J.M.*,

_____

[6] Section 5328(a)(4) requires the court to consider "[t]he need for stability and continuity in the child's education, family life and community life." 23 Pa.C.S. § 5328(a)(4)."

- 20 -

63 A.3d at 338). Father also contends that if reunification with Father does not occur soon the prognosis for reuniting him with his son "decreases into hopelessness on the part of both." *Id.* (quoting **Burnett**, 742 A.2d at 703).

We note that the **M.J.M.** case also states that if the Legislature had intended that "extra consideration be given to one parent because of his or her role as the primary caretaker, it would have included language to that effect." **M.J.M.**, 63 A.3d at 338. Obviously, we recognize that this language was not included in the custody factors to be considered by the court; however, Father overlooks the prefatory language that begins section 5328(a). That language directs that "[i]n ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child…." 23 Pa.C.S. § 5328(a). That is exactly what the trial court did in this case. While the court noted the reasons Father gave custody to Grandparents initially and commended him "for holding a steady, well[-]paying job[,]" and believed that Father "could maintain a loving, stable, consistent and nurturing relationship with Child[,]" the court found that Father's relationship with Farron was "a destructive force" that carried over to Farron's relationships with Child, her own children and those children's grandparents. TCO at 15 ¶ 9. These findings are supported by the evidence of record and, accordingly, we are compelled to conclude that Father's third issue is without merit.

In his final issue, Father claims that the court abused its discretion by finding that he would not provide a stable, consistent, loving and nurturing relationship with Child as set forth in 23 Pa.C.S. § 5328(a)(9).[7] Father contends that the court's statements in responding to this factor are contradictory, on the one hand stating that Father would provide this type of relationship, but also that he would not do so. Father then claims that the court's reasoning solely rested on the court's belief that Father would attempt to isolate Child from Grandparents and extended family. This claim is similar to Father's argument relating to custody factor (4), in which Father asserts that no testimony was provided showing that he neglected Child or lacked the skills necessary to properly care for Child. Rather, he claims that he lacked the opportunity, because of his limited time with Child, to show that he could care for Child both physically and emotionally.

Again, we must emphasize that the court did not find Father unable to properly care for Child, neither concluding that Father lacked the skills nor the ability. The thrust of the court's reasoning centered on the fact of Father's relationship with Farron and its concerns about her impact on Child and on Father's relationship with Child. As stated previously, these facts as found by the court are supported by the evidence of record. Accordingly, we

_____

[7] Section 5328(a)(9) directs the court to consider "[w]hich party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs." 23 Pa.C.S. § 5328(a)(9).

conclude that the trial court did not abuse its discretion by determining that Father could not provide the stable, consistent, loving and nurturing relationship with Child due to his living arrangement.

For the reasons provided above, we affirm the court's custody order awarding joint legal custody of Child to both Grandparents and Father, and awarding primary physical custody to Grandparents and partial physical custody to Father.

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:  3/30/2016